IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 3:20-CR-30151-SPM |
| | ) | |
| KORY R. SCHULEIN, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, through its undersigned counsel, in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission Guidelines Manual ("Guidelines" or "U.S.S.G.") hereby submits its position with respect to sentencing for the defendant, Kory R. Schulein.

The United States has no objection to the Guidelines' calculation and factual information contained in the Presentence Report. The Presentence Report accurately reflects that the defendant's advisory Guidelines range is 151 to 188 months. For the reasons stated herein, the United States respectfully submits that a sentence of 151 months' imprisonment followed by a ten-year term of supervised release reasonably and appropriately accounts for the factors set forth in 18 U.S.C. § 3553(a). The United States also recommends a fine waiver in lieu of the defendant's restitution obligations as reflected in the plea agreement. The United States contends that this sentence is sufficient but not greater than necessary to achieve the goals of sentencing.

**I. FACTUAL BACKGROUND**

A. The Defendant's Use of the Tor Network to Advertise and Distribute Child Sexual Abuse Materials

In July of 2019, the FBI learned that an individual was accessing hidden services on the Tor[1] anonymity network to facilitate the advertisement and distribution of child sexual abuse materials, also known as child pornography ("CSAM"). ECF No. 39 ("PSR"). The internet protocol ("IP") address associated with the individual (50.45.18.201) was traced to the defendant's residence. PSR at ¶12. The FBI determined that the defendant utilized the Tor network for purposes of promoting and distributing CSAM. *Id.*

From April 2015 through December 2017, the defendant was an active user of a website with the primary purpose of advertising and distributing CSAM. PSR at ¶14. The registration page displayed a welcome message which read: "*Do you believe in Love? We are girl-lovers, pedophiles, hebephiles. . .*" *Id.* This website provided users chat rooms to exchange messages. *Id.* The defendant was a prolific user of the chat function—between February 8, 2016, and December 3, 2017, the defendant posted **13,733 messages**, a large portion of which included links to CSAM, which depicted prepubescent female children engaging in sexual acts with adult males including:

- Oral rape;
- Penal ejaculation into a minor female's mouth;
- Adults ejaculating onto the face of a minor female. *Id*.

From April 22, 2018 through October 20, 2018, the defendant was an active user of another website that hosted links to child erotica. PSR at ¶15. The defendant held the rank of "guide" on this website (meaning he was a content moderator) and posted at least 144 messages, several of which contained links to child erotica including:

- A prepubescent child holding a pole exposing her genitalia;

---

[1] Tor refers to an internet-based computer network that provides anonymity online by routing IP addresses through multiple sites so that they are untraceable. Use of Tor indicates a relatively high level of technical sophistication.

- Four unclothed prepubescent children standing in the shower with exposed genitalia;
- A naked prepubescent child with handprints on her buttocks. *Id.*

B. <u>The Defendant's Extensive Collection of Child Sexual Abuse Materials</u>

On October 1, 2019, the FBI executed a search warrant at the defendant's residence. PSR at ¶16. Agents seized multiple electronic devices including external hard drives. One of the seized hard drives contained the following files:

- 9,136 images of CSAM
    - of those 1,105 were of children under the age of 12;
    - 135 images of children in bondage, humiliation, or torture; and
    - 20 images of children involved in bestiality.
- 177 videos of CSAM
    - 104 videos of children under the age of 12;
    - 33 videos of children in bondage, humiliation, or torture; and
    - 2 videos depicting toddlers. PSR at ¶19.

Below is a sampling of some of the content of those files. PSR at ¶21.

| Content |
|---|
| An image depicting a prepubescent female laying on her back with, what appears to be, an adult male vaginally raping her. The file name indicates that the child is 5 years old. |
| An image depicting a prepubescent female laying on her back with what appears to be an adult male inserting his condom-wrapped penis into her vagina and vaginally raping her. |
| A ten-minute video which depicts an adult male vigorously rubbing his penis on the genitals of two naked female toddlers. The male ejaculates on the mouth and body of one of the toddlers and then rubs the ejaculation on the other toddler's leg. |
| A video, 22 minutes and 26 seconds in length, depicting an adult male anally raping a prepubescent female. |

| |
|---|
| A video, 11 minutes and 2 seconds in length, depicting a naked prepubescent female performing oral sex on an adult male.  The male uses his penis to anally rape the female child and ejaculates into her anus.  An adult male then ejaculates on the female child's face. |
| A video, 8 minutes and 26 seconds in length, depicting an adult male anally raping a naked young female.  The male ejaculates on the female's genital area. |
| An image depicting a prepubescent female with an open mouth and tongue down with an adult male penis that appears to be on her tongue and inside part of her mouth.<br><br>The defendant admitted to knowing the child depicted in this image and having had an online romantic relationship with her.  He understood her to be 11 or 12 years old and from Scotland.<br>He had several images of her—one of which depicted her holding up a sign with his name on it.  The defendant admitted superimposing a picture of his own penis onto a picture of the child's open mouth and then using that image for sexual gratification, masturbation, and humor. |

When first interviewed by law enforcement, the defendant denied being familiar with certain CSAM internet sites; he later admitted that he was familiar with them and that he participated in the chat rooms.  PSR. at ¶17.  He also admitted that he used a certain internet site to distribute images and videos of CSAM.  *Id.*  In particular, the defendant recalled posting files from one particular series of CSAM in which a female child (approximately 8 years old) is orally raped.  *Id.*  The defendant also admitted to being a moderator on another website dedicated to advertising and distributing CSAM.  In order to gain membership to this website, the defendant was required to post CSAM.  He also identified multiple other websites on which he posted CSAM.  *Id.*  He admitted to saving CSAM images and videos on an encrypted hard drive (the contents of which are described above).  *Id.*

The defendant began viewing CSAM in 2013.  PSR at ¶18.  He masturbated to child sexual abuse materials because he found them "sexually arousing."  *Id.*

On October 21, 2020, a grand jury in the Southern District of Illinois returned a one-count indictment charging the defendant with violating 18 U.S.C. §2252(a)(2)(A) by knowingly downloading thousands of child pornography images and videos over the internet. ECF No. 1.

On November 2, 2020, the defendant was arraigned and entered a plea of not guilty. ECF No. 6. He was released on an unsecured bond with pretrial supervision—the terms of which included monitoring of electronic devices. PSR at ¶3.

On December 14, 2020 and January 20, 2021, the cyber monitoring reports from the defendant's cellular phone revealed that the defendant attempted to access pornographic websites on several occasions and downloaded a pornographic video application to his phone, but the cyber monitoring software blocked the use of the application. The software also prevented the defendant from successfully accessing a voyeurism website. *Id.*

On April 28, 2021, pursuant to a written plea agreement and stipulation of facts, the defendant pled guilty to the count charged. ECF No. 32.

## II.   APPLICABLE LAW

The guidelines are the "starting point and the initial benchmark" for determining a federal sentence. *Gall v. United States,* 552 U.S. 38, 49 (2007). A sentence is reasonable if the district court properly calculated the guidelines range and then exercised appropriate discretion in applying the factors specified in 18 U.S.C. § 3553(a). *United States v. Vaughn*, 614 F.3d 412, 414 (7th Cir. 2010). Those factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

  (C)  to protect the public from further crimes of the defendant; and

  (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentences and sentencing range established [by the Sentencing Guidelines];

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 .U.S.C. § 3553(a).

### III. GUIDELINES RANGE CALCULATION

The United States agrees with the Presentence Report's determination that the application of the Guidelines in this case yields a range of 151-188 months of incarceration. The defendant's total offense level is 34, and is calculated as follows:

| Guideline | Offense Level |
|---|---|
| Base Offense Level (Section 2G2.2 (a)(2)) | 22 |
| Possessed material which involved prepubescent minor under the age of 12 (Section 2G2.2 (b)(2)) | 2 |
| Knowingly engaged in distribution (Section 2G2.2 (b)(3)(F)) | 2 |
| Possessed material involving sadistic and masochistic conduct (Section 2G2.2 (b)(4)) | 4 |
| Used a computer in the commission of the offense (Section 2G2.2 (b)(6)) | 2 |

| | |
|---|---|
| Possessed 600 or more images of child pornography (Section 2G2.2 (b)(7)(D)) | 5 |
| Acceptance of Responsibility (Section 3E 1.1.(a)) | -2 |
| Acceptance of Responsibility (Section 3E 1.1.(b)) | -1 |
| **Total** | **34** |

### IV.  DISCUSSION OF THE § 3553 FACTORS

A.  <u>Nature and Circumstances of the Offense</u>

The United States' recommendation of a 151-month sentence followed by a ten-year term of supervised release is supported by the egregious nature and circumstances of the offense, including the defendant's sophistication; the prolonged nature of his offense; the large quantity of child sexual abuse materials involved; the defendant's active participation in a community of like-minded offenders; and the defendant's escalation of behavior over time, including "romantic" online contact with a prepubescent girl.

The defendant, a "gifted" student who graduated at the top of his class from high school and college, employed his intellect and technical sophistication to curate, collect, promote, advertise, and share a staggering amount of child sexual abuse material without detection for nearly ten years.  PSR at ¶¶64-67.  Specifically, the defendant exploited advanced technology, including the Tor network and encrypted drives, to anonymously gain and share access to the most heinous imagery of child sexual abuse material.  Upon searching the defendant's residence, law enforcement discovered that the defendant curated his collection on an encrypted hard drive on which he stored almost *10,000* images of child sexual abuse and almost *two hundred* videos of

child sexual abuse material. These images and videos depicted sadistic and masochistic conduct and the sexual abuse of real children as young as toddlers.

What is more, the defendant not only collected these horrific materials, but he promoted, advertised, and distributed them to others through the Tor network. He also occupied the role of "guide" or "moderator" on one of these horrific websites and was an active participant on the sites—sending over *13,000* messages in the chat rooms—often providing other chat participants with links to child sexual abuse material, thus perpetuating the cycle of child abuse. Over time, the defendant's behavior became more brazen, as he began an online "romantic relationship" with a child in Scotland who he believed to be either 11 or 12 years old. He even manipulated an image of this child to depict his penis in front of her open mouth. He admitted to using this image for masturbation. PSR at ¶21.

The extensive and abhorrent nature of the defendant's collection of child sexual abuse materials, the prolonged period in which he downloaded, promoted, advertised, and shared those materials, and the affirmative steps he took to keep his heinous activities secret, *i.e.*, the use of the Tor network and encrypted drives, all speak to the severity of his offense and warrant a sentence of 151 months of imprisonment followed by a ten-year term of supervised release.

B.       History and Characteristics of the Defendant

The defendant has no prior criminal convictions and by all accounts comes from a supportive and loving home. PSR at ¶45 and ¶55. He excelled at all levels of his education. PSR at ¶¶64-66. He is reported to be "gifted" when it comes to intellect and academics and has an "extremely high IQ." PSR at ¶67. Instead of using his intellect and talents for a lawful purpose, the defendant used those skills to sexually exploit the most vulnerable victims: children. Although he has no criminal history—something the Guidelines already take into account—the defendant by his own admission has not led a crime free life. Instead, as early as 2013, he sought out and

8

possessed child sexual abuse material. He was able to avoid detection by law enforcement for many years by using his "gifted" intellect and "extremely high IQ" to employ sophisticated technology, which allowed him to remain anonymous while he victimized children over the better part of a decade. The defendant's participation in these CSAM websites was prolific. He seemingly funneled countless hours and significant effort into promoting, distributing, and collecting child sexual abuse material. And, indeed, he had the time to do so. Despite his intellect and education, the defendant reports that he has been unemployed since August 2016 and relies on his parents for financial assistance. PSR at ¶69.

    C.    <u>Seriousness of the offense, respect for the law, just punishment, and deterrence</u>

The defendant not only possessed a vast amount of child sexual abuse materials, including photos and videos, but he also actively used websites to communicate with like-minded offenders and promote the exploitation of child sexual abuse materials through the dark web. Child sexual abuse material, a/k/a child pornography, causes grave harm to the children depicted in the images. The images and videos possessed by the defendant depict real children as young as toddlers subjected to devastating sexual abuse by adults, including vaginal rape, anal rape, oral rape, and various other forms of sexual abuse.

The United States Supreme Court has long since recognized the harm to children depicted in child pornography. In *New York v. Ferber*, 458 U.S. 747, 758 (1982), the Court noted that the "[child sexual abuse] materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation." *Id.* at 759 (citation omitted). The *Ferber* court reasoned:

> Pornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the [victim]'s actions are reduced to a recording, the pornography may haunt [the victim] in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating

> within the mass distribution system for child pornography. . . It is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions.

*Id.* at 759 & n. 10 (citations omitted.). *See also Osborne v. Ohio*, 495 U.S. 103, 109-10 (1990) (reaffirming *Ferber* in a case involving possession of child pornography); *United States v. Fredickson,* 996 F.3d 821, 825 (7th Cir. 2021) (recognizing that child pornography depictions are "a permanent record" of the child's victimization).

In 2002, the United States Supreme Court again acknowledged the harm to victims depicted in child pornography and observed that a new harm is caused each time the materials are shared with someone different. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 249 (2002). The Seventh Circuit has observed that "[t]he possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their individual interest in avoiding the disclosure of personal matters." *United States v. Sherman*, 268 F.3d 539, 547 (7th Cir. 2001) (reasoning that "because the children depicted in the pornography suffer a direct and primary emotional harm when another person possesses, receives or distributes the material," charged counts for distribution and possession should not be grouped together for sentencing purposes).

While some of the children depicted in the defendant's vast collection of child sexual abuse materials have not been identified, they are nevertheless real children who have been re-victimized by the defendant's conduct. *United States v. Shutic*, 274 F.3d 1123, 1126 (7th Cir. 2001). The Seventh Circuit in *Sherman* noted that even a "passive" participant—*i.e.*, someone who merely receives or possesses the images—"directly contributes to this continuing victimization." *Sherman*, 268 F.3d at 545 (citations omitted). The *Sherman* court further noted that "one of the reasons for criminalizing the 'mere' possession of child pornography is to create an incentive for

10

the possessor to destroy the material and alleviate some of these harms to the children depicted." *Sherman*, 268 F.3d at 547.

Here, the Court need look no further than the victim impact statements to understand the trauma caused by the defendant.[2] These victims are innocent children whose rape, sexual abuse, and exploitation the defendant voraciously consumed. Their statements detail how impossible it is for them to live any semblance of a normal life when people like the defendant continue to seek out images of their young, immature bodies being horrifyingly abused for their own perverse sexual gratification.

The victim of the "Tara" series, for instance, submitted a victim impact statement that offers a horrifying glimpse into the trauma that child pornography victims commonly experience. She describes being stalked by sexual predators who know that she is the victim depicted in so many graphic rape videos circulating online, so much so that she was forced to move out of her home and stay off all social media sites. "Every time someone views this trash," she writes, "he is once again making me re-live the most horrific part of my childhood. I can never truly heal because the perpetrators and stalkers never allow me to do so.... These people need to be punished for taking away a major part of my childhood and sense of security."

This is the future envisioned by the mother of the young girl depicted in the "At School" series. She writes that her daughter was sexually abused on camera for four years, resulting in

> despicable images and videos that will forever be available to a person who seeks and finds pleasure in abusing children. Thousands upon thousands of people, all over the world have access to images of our little girl during her darkest days, to do so as they wish with those images. A person can download her image, create their own child pornography movie, share it with other monsters, or keep it for themselves to continually exploit our daughter in their own private bedroom.

---

[2] Victim impact statements for 11 identified child pornography series have been recently provided to the defense, as well as to the United States Probation Office for inclusion in an addendum to the PSR.

She goes on to explain that her daughter has essentially suffered a life sentence because of the continued demand for her sexual abuse images and videos, and that the knowledge that her abuse is memorialized on the internet for people like the defendant to view and share forever "will shatter her soul."

The availability of child sexual abuse materials has grown dramatically with the advent of the Internet and online communities (like those frequented by the defendant) to validate child sexual exploitation. This behavior devastates children around the world and must be deterred. As the exploitation of children continues to grow in this unprecedented climate of school closures, increased online learning, and widespread social distancing, children are more at risk and vulnerable now to sexual exploitation than ever before. In 2020, the National Center for Missing and Exploited Children (NCMEC) saw a 97.5% increase in online enticement reports and a 28% increase in CyberTipline reports when compared to 2019. *See* "COVID-19 and Missing & Exploited Children" (NCMEC 2021), available at https://www.missingkids.org/blog/2020/covid-19-and-missing-and-exploited-children (last accessed July 21, 2021). Stopping the supply and demand of child sexual abuse materials—both to prevent the victims from being revictimized through viewing of their sexual abuse and to prevent new children from being victimized to satiate the demand for these materials—is paramount.

A 151-month sentence is also necessary to promote respect for the law through adequate punishment and to afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(B). As detailed above, the defendant utilized websites for the purpose of advertising and distributing child sexual abuse material. He also downloaded and collected *thousands* of images and videos depicting child sexual abuse materials. In doing so, he revictimized each child depicted in those materials with each viewing of the abuse they suffered. The defendant's sentence should reflect

the seriousness of the harm that the victims suffered and continue to suffer. A ten-year term of supervised release to follow 151 months of imprisonment will also serve to protect the victims.

## V. CONCLUSION

For the foregoing reasons, the United States respectfully recommends that this Court sentence the defendant to a term of 151 months of imprisonment followed by a ten-year term of supervised release.

Respectfully submitted,

STEVEN D. WEINHOEFT
United States Attorney


*/s/ Nathan D. Stump*
NATHAN D. STUMP
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, IL  62208
nathan.stump@usdoj.gov
(618) 628-3700
Fax:  (618) 628-3720

ALICIA A. BOVE
Trial Attorney
Department of Justice
1301 New York Ave NW
Washington, DC 20003
(202) 616-5313
